# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF ALASKA

In re:

TRACY RENEE PETROSINE,

Debtor.

Case No. A11-00424-DMD
Chapter 7

## EXEMPTION MEMORANDUM

Creditor Urgent Care of Lake Lucille, Inc. and chapter 7 trustee Kenneth Battley have objected to the debtor's amended claim of exempt property. Determination of objections to the debtor's claim of exemptions is a core bankruptcy function under 28 U.S.C. § 157(b)(2)(B). This court has jurisdiction pursuant to 28 U.S.C. § 1334(b) and the district court's order of reference. I find in favor of Urgent Care of Lake Lucille and Mr. Battley. The debtor's claim of exemptions will be disallowed as to any and all of her jewelry which has been scheduled or discovered or which may in the future be discovered. The debtor has also forfeited her right to exempt any other property of value which the trustee may liquidate, whether such property has been disclosed or has yet to be discovered.

Background

From July of 2006 until November 18, 2009, debtor Tracy Petrosine was employed by Urgent Care of Lake Lucille, Inc. ("Urgent Care"), as a clinic administrator.[1] In this position, she had access to Urgent Care's assets, including its checking and charge accounts. After accounting discrepancies were noticed, an audit was performed. Urgent

---

[1] The facts regarding the debtor's employment with Urgent Care and the criminal charges that were subsequently brought against her are taken from Count III of Urgent Care's Complaint to Determine Dischargeability of Debt, filed Nov. 22, 2011, in Adversary Case No. A11-90029 (Docket No. 1). The debtor did not answer or otherwise respond, and a default judgment was entered against her on Feb. 10, 2012.

Care discovered that Petrosine had committed numerous acts of fraud and theft leading to losses of over $73,000.00 in cash and $28,536.93 in auditing fees. On April 16, 2010, the State of Alaska filed 21 felony charges of fraud, forgery and theft against the debtor in *State of Alaska v. Petrosine*, Case No. 3PA-10-00954 CR. On July 25, 2011, Petrosine pled guilty to one felony count of theft for stealing property with a value greater than $25,000.00. The remaining charges in the state's complaint were dismissed. Petrosine was sentenced to one year in jail with two years suspended. She was to make restitution and remain on probation for five years.[2]

Prior to her incarceration, Petrosine filed a petition for chapter 13 relief on May 31, 2011. In her schedule of exempt property, she took state exemptions.[3] She claimed a homestead exemption of $26,457.00, and also exempted $2,018.40 in cash and a total of $1,775.00 in miscellaneous personal property, including living room furniture, bedroom furniture and clothing.[4] Additionally, she exempted "Women's Cosmetic Jewelry" with a value of $200.00.[5] J. Mitchell Joyner withdrew as the debtor's attorney on August 31, 2011. The case was converted to chapter 7 on the same day. Kenneth Battley was appointed as chapter 7 trustee on September 1, 2011.

Petrosine's initial § 341 meeting was scheduled for September 29, 2011. It was continued numerous times and concluded on March 29, 2012. At the continued § 341

---

[2] This information was acquired from CourtView records regarding *State of Alaska v. Petrosine*, Case No. 3PA-10-00954 CR, accessible at: http://www.courtrecords.alaska.gov.

[3] Schedule C - Property Claimed as Exempt, filed Jun. 21, 2011 (Docket No. 19 at 8).

[4] *Id.*

[5] *Id.*

2

meeting held on October 18, 2011, in response to questioning from Urgent Care's counsel, the debtor revealed that she had placed some of her personal items in a storage locker in Wasilla. She testified that her former husband, Mr. Cyphert, had the key to the locker, and she described the items in the locker as her bicycle, her bed, her children's bunkbeds and clothing, and some craft items.[6] She also testified that Cyphert personally was holding her wedding ring, valued at "a couple thousand dollars," and that she believed she had listed the ring on her schedules.[7] Her statement as to the wedding ring was inaccurate; the debtor had scheduled and exempted just $200.00 in costume jewelry.

At the October 18, 2011, § 341 meeting, the trustee obtained Cyphert's phone number from the debtor so he could get the key to the storage locker.[8] The § 341 meeting was continued to November 18, 2011, and again continued to December 15, 2011, because Petrosine did not appear at the meeting scheduled for November. Between the October 18, 2011, creditor's meeting and the December 15, 2011, meeting, Petrosine placed numerous telephone calls to a friend of hers, Achillius Gagnon, from the Hiland Mountain Correctional Center where she was incarcerated. She had additional telephone conversations with Gagnon the day following the continued creditor's meeting held December 15, 2011, and the day of her final creditor's meeting, held February 9, 2012.

---

[6] Tr. of § 341 Hearing held Oct. 18, 2011 (Urgent Care's Ex. G), at 7:22-8:16.

[7] *Id.* at 6:17-7:10.

[8] *Id.* at 9:1-14.

3

Because Petrosine's telephone conversations with Gagnon occurred during her incarceration, they were recorded by the correctional center.[9] These telephone conversations revealed that Petrosine enlisted Gagnon's assistance to remove some of her belongings from the storage locker in order to keep these assets away from the trustee and Urgent Care.[10] In a phone call placed on December 12, 2011, Petrosine urged Gagnon to get her possessions out of the storage locker and "try to leave it the way it looked before." She instructed Gagnon to retrieve: (1) a purple canvas rolling cart; (2) a large plastic tub with jewelry; (3) a dry sink with a marble top and a wood base; (4) a tub with crystal and china; (5) an antique hobby horse; and (6) blue and black jewelry cases.[11]

In a Rule 2004 examination, Gagnon admitted that Petrosine asked him to get the key to the storage locker from Cyphert "so that no one would get into it, I guess."[12] After he obtained the key, Gagnon said he opened the storage locker on more than one occasion, but contended he only removed the debtor's glasses from the unit.[13] The veracity of these statements is squarely contradicted by the recorded telephone conversations between Petrosine and Gagnon.

---

[9] In the related adversary proceeding, Urgent Care obtained a subpoena so that it could acquire an electronic copy of every telephone conversation Petrosine made to Gagnon during her incarceration. *See* Order on Mot. for Court Approval to Subpoena Telephone Records, entered May 14, 2012 (Docket No. 13) in *Urgent Care of Lake Lucille v. Petrosine (In re Petrosine),* Adv. No. A11-90023-DMD.

[10] Urgent Care introduced into evidence two CDs that contained audio recordings of telephone calls Petrosine had placed to Gagnon while she was being held at Hiland Mountain Correctional Center. *See* Urgent Care's Ex. F. While many of the recordings are of poor quality, they are sufficiently decipherable to determine that the debtor made these requests of Gagnon.

[11] Urgent Care's Ex. F (Dec. 12, 2011, phone conversation between the debtor and Mr. Gagnon, Recording No. 1323735494).

[12] Urgent Care's Ex. D (Tr. of R. 2004 Exam. of A. Gagnon, held May 9, 2012, at 14:17-18.).

[13] *Id.* at 16:18-17-23, 19:22-21:2.

4

Petrosine's § 341 meeting was concluded on February 9, 2012. The trustee first obtained access to the storage locker on February 16, 2012, and he secured it on that date. Urgent Care filed a timely objection to the debtor's claim of exempt property on April 13, 2012. Attorney Frank Cahill entered an appearance for Petrosine on May 7, 2011. He filed amended Schedules B and C for the debtor on May 11, 2012. The amended schedules disclosed substantially more assets than those initially filed. Additionally, Petrosine switched from state to federal exemptions. Urgent Care filed a timely objection to the amended claim of exemptions on May 16, 2012.

Petrosine and Urgent Care entered into a stipulation which allowed her to take possession of certain personal and household items that were held in the storage locker. She was to have access to the locker on May 30, 2012, for up to four hours so she could remove items that were reasonably necessary to set up her living quarters.[14] The parties agreed that no antique furniture would be removed from the locker at this time.

Ken Battley, the chapter 7 trustee, filed an objection to the debtor's claim of exempt property on June 21, 2012.[15] Battley joined Urgent Care's objection. He noted that, even after amendment, Petrosine's Schedule B was inadequate. Her amended Schedule B itemized 22 pieces of jewelry with a collective value of $3,875.00 and additional "uncounted

---

[14] Stipulated Order Relating to Debtor's Claim of Exemptions, filed May 25, 2012 (Docket No. 103). The debtor needed these basic items after her release from the correctional center.

[15] Trustee's Obj. to Debtor's Exemptions, filed Jun. 21, 2012 (Docket No. 108). The trustee's objection was timely. "The trustee may file an objection to a claim of exemption at any time prior to one year after the closing of the case if the debtor fraudulently asserted the claim of exemption." Fed. R. Bankr. P. 4003(b)(2).

5

jewelry" valued at $950.00.[16] Battley had, in fact, removed more than 300 pieces of jewelry from the storage locker.[17]

An evidentiary hearing on Urgent Care's and the trustee's objections to Petrosine's amended claim of exemptions was held on August 9 and 10, 2011. Post-trial briefs were submitted by Urgent Care and Petrosine. The matter is now ripe for ruling.

Analysis

It has long been understood that bankruptcy relief is intended for the "honest but unfortunate debtor."[18] A bankruptcy discharge is a privilege that hinges upon a debtor's honesty in disclosing his financial affairs.[19] Provisions throughout the Bankruptcy Code make this clear. A chapter 7 debtor who removes or conceals property of the estate with the intent to defraud creditors or the trustee may be denied a discharge.[20] If a debtor obtains money or property through fraud, the affected creditor's claim may be excepted from discharge.[21]

Further, while a debtor may generally amend his petition, schedules or statements as a matter of course any time before the case is closed,[22] such amendments may

---

[16] Trustee's Obj. (Docket No. 108), at 2.

[17] *Id.*

[18] *Local Loan Co. v. Hunt*, 293 U.S. 234, 244 (1934).

[19] *Grogan v. Garner*, 498 U.S. 279, 286-87 (1991).

[20] 11 U.S.C. § 727(a)(2).

[21] 11 U.S.C. § 523(a)(2)(A).

[22] Fed. R. Bankr. P. 1009(a).

6

be disallowed by the court upon "a showing of bad faith or prejudice to third parties."[23]  "The usual ground for a finding of 'bad faith' is the debtor's attempt to hide assets."[24]  Not only can the court disallow a debtor's claimed exemptions on these grounds, in exceptional circumstances, a debtor's exempt property may be surcharged for his failure to disclose or account for non-exempt assets.[25]

Here, Urgent Care and the trustee seek disallowance of Petrosine's exemptions on the grounds of bad faith.  They bear the burden of establishing that her exemptions should be disallowed by a preponderance of the evidence.[26]  They have met this burden with overwhelming evidence of concealment and bad faith by Petrosine.  A simple comparison between Petrosine's original and amended schedules B is shocking.  Urgent Care has prepared an itemized comparison of these two documents that highlights the complete inadequacy of Petrosine's initial disclosures.[27]  Under the category of household goods, amended Schedule B lists more than 45 new items, including some that might be considered unique or extraordinary.[28]  Under "furs and jewelry," amended Schedule B lists nine new items of jewelry with a gross value of over $4,800.00.  Petrosine's initial schedules listed costume jewelry worth only $200.00.  Even the amended Schedule B is inadequate because

---

[23] *Greene v. Savage (In re Greene)*, 583 F.3d 614, 625-26 (9th Cir. 2009), *citing Arnold v. Gill (In re Arnold)*, 252 B.R. 778, 784 (B.A.P. 9th Cir. 2000).

[24] *Arnold*, 252 B.R. at 778.

[25] *Latman v. Burdette*, 366 F.3d 774, 785-86 (9th Cir. 2004).

[26] Fed. R. Bankr. P. 4003(c)*; see also Grogan v. Garner*, 498 U.S. 279 (1991).

[27] Urgent Care's Obj. to Debtor's Am. Claim of Exemptions, filed May 16, 2012 (Docket No. 96), Ex. 1.

[28] These items include a dentist chair and a 3/4 size wrought iron bed frame.

it undervalues or fails to itemize numerous additional items of jewelry. As noted above, the trustee has removed over 300 items of jewelry from the storage locker.

Petrosine's original Schedule B failed to list any silver jewelry. Her amended Schedule B lists "Silver rings, earrings, necklaces, bracelets" with a value of just $550.00. Petrosine failed to note that a charm bracelet and several other silver items of jewelry were manufactured by Tiffany and Company, a major brand name in jewelry. George Walton, the owner of Walton's Gold & Diamond Company, is an expert jeweler. He examined the jewelry removed from the storage locker and testified at the hearing. In his opinion, the Tiffany charm bracelet with charms was worth $2,000.00. Other items viewed by Walton included a Tiffany extra-wide cuff, a heart locket, and a bracelet with a padlock. Walton believed the cuff would retail at $950.00 and had a wholesale price of $550.00. The heart locket had a list price of $500.00 and a wholesale price of $250.00. The retail value of the padlock bracelet was $600.00. Even assuming a wholesale price drop of 50% on the charm bracelet and the padlock bracelet, Petrosine had at least $2,100.00 of Tiffany and Company silver jewelry.

More sterling silver was found in the locker as well, in two blue, flat boxes that contained a wide variety of jewelry. Walton estimated the pieces found in the blue flat boxes to be worth $6,500.00 to $7,000.00. Wholesaling all the silver found in the storage locker at 50% yields a total value of $5,350.00. Considering the number of pieces found and the significant value for many of the items, the court can reach no other conclusion than that the debtor deliberately attempted to conceal these items. She not only failed to list her silver jewelry on her initial Schedule B, she grossly undervalued it on her amended Schedule B.

8

Walton also viewed a set of gold and diamond studded earrings that the debtor initially failed to list. On her amended schedule B, Petrosine listed "1/2 ct." diamond studs with a value of $250.00. Walton found that each diamond was about 3/4 carat, and placed the liquidation value for the earrings at $3,000.00.

A black, flat box of miscellaneous gold jewelry was also removed from the storage unit. Walton examined the pieces in that box and estimated their collective value to be between $3,000.00 and $3,500.00. The gold jewelry was not listed on either the original or amended Schedule B.

The debtor did list a white gold wedding ring and Moisenite stone engagement ring with a premium setting on her amended Schedule B. She placed a collective value of $3,000.00 on these items. However, she also had a wedding set (engagement ring and band), made by Gelin & Abaci with a fair market value of $8,000.00. This wedding set was not disclosed on either her initial or amended Schedule B.

Compelling evidence of Petrosine's fraud and deceit is found by simply comparing the disclosures on her initial and amended schedules against the jewelry found in the storage locker. The timing and content of Petrosine's telephone calls to Gagnon while she was incarcerated provide further evidence of her attempts to conceal her assets. The calls to Gagnon started shortly after the October 18, 2011, creditor's meeting in which the trustee, Kenneth Battley, asked Petrosine how he could obtain the key to the storage locker. Although Petrosine told Battley how to contact her former husband, who had the key, she thereafter called Gagnon and asked him to obtain the key so that no one else could get into the locker. She also called Gagnon the day after a continued § 341 meeting conducted December 15, 2011, and the day of her final creditor's meeting, held February 9, 2012.

Not only is the timing of these telephone calls reflective of Petrosine's bad faith, the content of these calls irrefutably supports a finding of bad faith. Petrosine asked Gagnon to remove certain items from the locker and instructed him to try to leave the locker looking like it had been unopened. We will never know the extent of Gagnon's success in retrieving items from the locker because there is no prior inventory to work from and both Petrosine and Gagnon are not credible witnesses. It is certain, however, that Gagnon did go to the storage unit on more than one occasion. Based upon the content of the recorded telephone conversations, I believe he took a number of items from the unit.[29] Such brazen, criminal behavior by Petrosine and her cohorts warrants denial of her claim of exempt property as to the jewelry as well as to any property remaining in the storage locker located at Alaska Mini-Storage in Wasilla.

In her post-trial brief, Petrosine argues that her initial failure to disclose assets should be blamed on the inadequate assistance of her former attorney, and that her subsequent disclosures on amended Schedule B are sufficient to exculpate her former omissions. In light of the overwhelming evidence of the debtor's bad faith, provided largely through the diligent discovery and efforts of Urgent Care, I find the debtor's arguments meritless.

<u>Conclusion</u>

Urgent Care and the trustee have objected to the debtor's amended exemptions and have established, by a preponderance of evidence, that the debtor has acted in bad faith

---

[29] Urgent Care's Ex. F (Nov. 3, 2011, phone conversation between the debtor and Mr. Gagnon, Recording No. 1326486147). Mr. Gagnon indicated that he would go to the storage unit and do what he needed to do. He also stated that when he was done, there would not be much left to go through.

10

by deliberately attempting to conceal her assets. Their objections will be sustained. The debtor's claim of exemptions will be disallowed as to any and all of her jewelry which has been scheduled or discovered or which may in the future be discovered. The debtor has also forfeited her right to exempt any other property of value which the trustee may liquidate, whether such property has been disclosed or has yet to be discovered.

An order will be entered consistent with this memorandum.

DATED: September 13, 2012.

BY THE COURT

 /s/ Donald MacDonald IV
DONALD MacDONALD IV
United States Bankruptcy Judge

Serve:	M. Boutin, Esq.
F. Cahill, Esq.
E. LeRoy, Esq.
K. Battley, Trustee
U. S. Trustee